# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1877V

| | |
|---|---|
| MICHAEL MAXWELL,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: August 15, 2023 |

*Alison H. Haskins, Maglio Christopher & Toale, PA, Sarasota, FL,* for Petitioner.

*Tyler King, U.S. Department of Justice, Washington, DC,* for Respondent.

**RULING ON ENTITLEMENT**[1]

      On September 21, 2021, Michael Maxwell filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as defined by the Vaccine Injury Table, or, in the alternative a caused-in-fact injury, after receiving an influenza ("flu") vaccine on October 26, 2018. Petition at ¶¶ 1, 21-22. He further alleges that his "vaccine related injuries have lasted more than six months." *Id.* at ¶ 20; *see* Section 11(c)(1)(D) (the Vaccine Act's severity requirement).

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties dispute Petitioner's ability to establish severity. For the reasons set forth below, I find Petitioner likely suffered the residual effects of his GBS for more than six months, and he has satisfied the other requirements of a compensable Table GBS injury. Petitioner is thus entitled to compensation under the Vaccine Act.

### I. Relevant Procedural History

Approximately two months after filing the Petition, Mr. Maxwell file a declaration[3] and the medical records required under the Vaccine Act. Exhibits 1-11, ECF Nos. 10-11; *see* Section 11(c). On April 7, 2022, the case was activated and assigned to the "Special Processing Unit" (OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 17.

After Respondent expressed a concern regarding the lack of evidence he deemed had been established in support of the Vaccine Act's severity requirement, the parties discussed how to move forward. *See* Order, issued July 22, 2022, ECF No. 26 (regarding the parties' call on July 12, 2022). Emphasizing entries in the medical records related to ongoing fatigue, Petitioner insisted there was sufficient evidence to show the required six months sequelae, and the parties proposed I resolve the issue after briefing. *Id.* at 1.

To that end, on November 7, 2022, Petitioner filed a motion with accompanying memorandum requesting that I find Petitioner entitled to compensation and seeking an award of $179,674.11, representing $175,000.00 for his pain and suffering and $4,674.11 for his past unreimbursed expenses. Petitioner's Memorandum of Law in Support of Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Entitlement to Compensation and Damages at 35, ECF No. 31-1; *see also* ECF No. 31 (the cursory, one-page motion). Petitioner also provided additional evidence to support his claims of entitlement and damages: declarations from Petitioner, his mother, and his lacrosse coach;[4] updated medical records; high school records; medical literature; documentation showing his expenses; photographs; and documentation showing the medical standards for military service. Exhibits 15-29, ECF No. 32.

In response, Respondent filed a Rule 4(c) Report requesting dismissal in light of Petitioner's alleged inability to show six months of severity. Respondent's Rule 4(c)

---

[3] Petitioner's declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 8.

[4] These declarations were signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibits 15-16, 19.

Report and Response ("Opp."), filed Dec. 22, 2022, at 2, 9, ECF Nos. 34-35.[5] Although he acknowledges that Petitioner's injury meets the requirements of a Table GBS injury, he did not address the amount of compensation Petitioner seeks. *Id.* at 6; *see* 42 C.F.R. § 100.3(a)(XIV)(D); 42 C.F.R. § 100.3(c)(15) (requirements for a Table GBS injury).

The matter is now ripe for adjudication.

## II.     Finding of Fact Regarding Duration

At issue is whether Petitioner continued to suffer the residual effects of GBS for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A.     Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). "The medical records made at the time treatment was sought or provided are far more reliable than the witnesses' testimony, five years later, to the contrary." *Id.* at *20.

However, this rule does not always apply. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.,* 23 Cl. Ct. 726, 733 (1991) (quoting with approval the standard used by the special master below), *aff'd per curiam,*

---

[5] This document was filed twice using two different CM/ECF events: as a response at ECF No. 34 and as a Rule 4(c) Report at ECF No. 35.

968 F.2d 1226 (Fed. Cir. 1992). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Claims Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery,* 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other relevant and reliable evidence contained in the record. *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B. Analysis

My determination is based on a complete review of the record, including all medical records, declarations, arguments, and additional evidence. Specifically, I highlight the following:

- Prior to his GBS illness, Petitioner was a healthy 17 year-old who played lacrosse, participated in ROTC, and wanted to be a Navy Seal. Exhibit 6 at 5-16, 37-57.

- On October 26, 2018, Petitioner received the flu vaccine during a vaccination clinic held at his high school. Exhibit 1.

- On November 16, 2018 (21-days post-vaccination), Petitioner visited an urgent care clinic, complaining of a headache and sinus congestion for four

4

days. Exhibit 4 at 2. He was diagnosed with sinusitis and prescribed a Medrol Pak. *Id.*

- Three days later, on November 18, 2018, during a beach vacation with his family, Petitioner visited the emergency room ("ER"), complaining of leg weakness and cramping and a headache which "comes and goes." Exhibit 5 at 9. Indicating that he had been prescribed amoxicillin and prednisone for his headache (thought to be caused by sinusitis), Petitioner characterized his lack of strength and achiness as moderate. *Id.* Due to the absence of evidence of a sinus infection, Petitioner was instructed to cease taking the medication previously prescribed. *Id.* at 14-15. Diagnosed with possible "rhabdomyolysis[6] from aggressive exertional activities like lacrosse and volleyball," Petitioner was instructed to aggressively hydrate and cease all strenuous activities. *Id.* at 15.

- On November 21, 2018, Petitioner visited the ER near his home, complaining of weakness in his upper and lower extremities, a headache, and hand and facial numbness progressively worsening since November 17, 2018. Exhibit 2 at 37, 382, 400. Unable to walk due to an extremely unsteady gait, he reported having a recent viral illness. *Id.* at 37, 395, 400. Based upon the results of a lumbar puncture and MRI, Petitioner was diagnosed with GBS and administered a 5-day course of IVIG therapy. *Id.* at 382, 396, 400. He began speech and occupational therapy on November 23, 2018. *Id.* at 422-23.

- On November 30, 2018, Petitioner was transferred to an inpatient rehabilitation facility. Exhibit 2 at 740-42. Believed to be suffering from GBS, hypertension, and headaches controlled by medication, Petitioner was expected to require skilled nursing care and at least three hours of daily therapy for ten to fourteen days. *Id.* at 741-42. During these sessions, Petitioner was described as motivated (*e.g., id.* at 754), but often requiring breaks to manage his fatigue (*e.g., id.* at 762). By December 4, 2018, he reported feeling normal again. *Id.* at 771. After showing remarkable progress and achieving all physical and occupational goals, Petitioner was discharged on December 5, 2018, without any needed medical equipment. *Id.* at 833. The medications needed to control his high blood pressure and headaches were discussed, but it was noted that he had not needed them for the previous five days. *Id.*

---

[6] Rhabdomyolysis exertional involves severe muscle soreness and recumbency "due to intense, prolonged physical exertion." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1637 (32th ed. 2012).

- Seen by his pediatrician the next day, on December 6, 2018, Petitioner was observed to be upbeat, but having an unsteady gait, reduced strength (with greater weakness on the right side), and abnormal reflexes. Exhibit 6 at 33-34. Instructing Petitioner to visit a neurologist for his follow-up care, the pediatrician warned his mother that Petitioner may require a gradual return to school. *Id.* at 35.

- On December 19, 2018, Petitioner was placed on a school IAP (Individual Accommodation Plan), also known as a 504 plan, allowing him additional transition time, breaks, a flexible schedule, and preferential seating. Exhibit 17. The next review date for the plan was listed as June 1, 2022. *Id.*

- On December 31, 2018, Petitioner began outpatient physical therapy ("PT"). Exhibit 2 at 872.

- At his next PT session on January 3, 2019, Petitioner exhibited no signs of instability or fatigue but several instances of a jump in his heart rate. Exhibit 2 at 884. He was told he could perform agility drills and plyometrics but should monitor his heart rate and perceived exertion. *Id.*

- After his third and last PT session on January 4, 2019, Petitioner was cleared for "a gradual return to his sport" (lacrosse) but cautioned "to monitor his heart rate and perceived exertion as well as to look for signs of fatigue." Exhibit 2 at 886. He was prescribed a home exercise program. *Id.*

- On February 4, 2019, Petitioner presented for a neuropsychological evaluation. Exhibit 6 at 61. Although Petitioner and his parents reported "significant improvement overall since early January," his mother thought "he seems to tire a little more easily." *Id.* Petitioner indicated that the "mild difficulty with his attention, processing, and memory" that he had experienced at the time of his discharge (December 5th) had resolved. *Id.* After the examination, the neuropsychologist described Petitioner as "gradually returning to his pre-illness level of activity," adding that "[h]is stamina remains somewhat diminished." *Id.* at 66. She stressed the importance of taking breaks during physical or mental activity. *Id.*

- The next day (February 5, 2019), Petitioner was evaluated by a pediatric neurologist. Exhibit 6 at 59. After examining Petitioner, the pediatric neurologist concluded that "clinically [Petitioner] had made a complete resolution of episode and [had] no obvious neurologic deficits." *Id.*

- On February 12, 2019, Petitioner was seen by his pediatrician who, based upon the recommendation of the pediatric neurologist, stated Petitioner could resume playing lacrosse. Exhibit at 29, 31. Indicating he was working out and training, Petitioner reported "no residual deficits or weakness." *Id.* at 29. The results of the examination were normal. *Id.* at 30-31.

- Later in February 2019, Petitioner passed a clinical assessment by a certified driver rehabilitation specialist. Exhibit 2 at 946-49. He was deemed able to use his current learner's permit to undergo Behind-The-Wheel training. *Id.* at 949.

- After demonstrating "no problems that would interfere with his driving ability" during training, Petitioner was authorized to undergo testing to acquire his driver's license. *Id.* at 945.

- On July 30, 2019, Petitioner returned to his pediatrician for an annual physical. Exhibit 6 at 23. At that visit, he was characterized as slowly getting back to normal after his GBS. *Id.* Indicating that he played a full year of lacrosse, he reported an ability to keep up despite "some fatigue." *Id.* Although the pediatrician cleared Petitioner to continue playing lacrosse, he "discussed the importance of not getting over scheduled for his senior year." *Id.* at 26.

- In his second declaration, signed in early October 2022, Petitioner contrasted his condition prior to and after his GBS illness. Exhibit 15. Although he was able to return to school in January 2019, he required a modified schedule to avoid fatigue, experienced issues with his mental and physical stamina, and was given additional time when taking tests. *Id.* at ¶ 12. Although able to play lacrosse during the Spring of 2019, Petitioner indicated that he encountered difficulties due to fatigue and a loss of muscle mass. *Id.* at ¶ 13. He described his motivation to return to lacrosse, his disappointment when learning that his dream of joining the military (possibly as a Navy Seal) was no longer possible, and his continued struggles with stamina and endurance. *Id.* at ¶¶ 2, 8-9, 16.

- In her declaration, Petitioner's mother similarly described her son's excellence condition prior to his illness, his motivation to improve thereafter, and the difficulties he endured. Exhibit 16. Providing additional details about the disappointment her son experienced after being informed he could not join the military or play lacrosse at the college level, she also mentioned

      anxiety her son experienced during his illness and recovery. *Id.* at ¶¶ 11, 14, 16.

- In his declaration, signed in November 2022, Petitioner's lacrosse coach provided further details regarding differences in Petitioner's playing abilities and condition prior to and after his GBS illness. Exhibit 19. He contrasted Petitioner's former capacity to play most of the game with his struggles after his illness. *Id.* at ¶¶ 2, 7. Describing Petitioner as "much smaller, weaker, and considerably slower," he stated that he was forced to place Petitioner on the junior varsity team, rather than the varsity team as previously expected. *Id.* at ¶ 5.

Although Petitioner experienced the swift resolution of his more-concerning GBS sequelae (the weakness and numbness in his upper and lower extremities), the above medical entries and declarations show he likely continued to suffer symptoms (specifically fatigue) for more than six months post-vaccination. As late as July 30, 2019, during an appointment with his pediatrician, Petitioner reported that he was still experiencing "some fatigue." Exhibit 6 at 23. And his lacrosse coach described Petitioner as "much smaller, weaker, and considerably slower" throughout the Spring 2019 season. Exhibit 19 at ¶ 5.

To satisfy the Vaccine Act's severity requirement in this case, Petitioner must show that he suffered the residual effects of his GBS illness for more than six-months. Section 11(c)(1)(D)(i) (severity requirement for cases not involving death or inpatient hospitalization and surgical intervention). Thus, he must establish that his GBS sequelae continued beyond at least May 18, 2019 (assuming an onset date from November 12-18, 2018 – which the record preponderantly supports).[7]

When arguing that Petitioner has failed to meet this requirement, Respondent emphasizes his discharge from therapy in late March 2019, approximately five months post-vaccination, and the citation by his pediatrician[8] in late July 2019 of the pediatric neurologist's earlier opinion that "[P]etitioner had been back to normal in February of

---

[7] Although some special masters have interpreted the language of Section 11(c)(1)(D)(i) as requiring sequelae beyond six months of the vaccination date, "I believe a more reasonable interpretation is that, since the six-month period measures severity of injury, it cannot begin *before* the time of injury, and hence is properly measured from the date of *onset.*" *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497, at *2 n.5 (Fed. Cl. Spec. Mstr. Mar. 30, 2022); *But see Herren v. Sec'y of Health & Hum. Servs.,* No. 13-1000V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. Feb. 18, 2014) (stating the contrary view – that the six-month period should be calculated from date of vaccination).

[8] Respondent mistakenly attributes the citation to a neurologist. *Compare* Opp. at 7 *with* Exhibit 6 at 23-26 (showing the visit was with Petitioner's pediatrician).

8

2019." Opp. at 7 (citing Exhibit 2 at 910[9] and Exhibit 6 at 23). However, Respondent ignores entries from that same time indicating that Petitioner continued to suffer fatigue, lacked stamina, and to require breaks to avoid mental and physical fatigue. *See* Exhibit 6 at 61, 66 (comments made by Petitioner's neuropsychologist and mother on February 4, 2019). And in the same cited July 30, 2019 record, Petitioner indicated that he continued to experience "some fatigue." *Id.* at 23.

Although the pediatric neurologist's conclusion, expressed in early February 2019, that Petitioner had *clinically* recovered and had "no obvious neurologic deficits" (Exhibit 6 at 59), certainly undercuts the conclusion that Petitioner's health issues lingered for a substantial period of time post-onset, this treater's opinion was clearly focused upon the more significant symptoms of GBS and need (or not) for further treatment. Thus, the neurologist's limited statements should not be interpreted as endorsing a complete recovery of all symptoms. Moreover, there is sufficient evidence to counter these statements.

As long as it cannot be attributed to a condition other than the GBS, the fatigue Petitioner continued to experience is sufficient to satisfy the severity required by the Act. It need not be severe, or even constant. As illustrated in the medical literature provide by Petitioner fatigue is a common symptom of GBS. Exhibits 20-25. As there is no evidence linking his fatigue to any other condition, it constitutes six-months of sequelae in this case.

I thus find that the record supports a finding of GBS sequelae at least through late July 2019. Accordingly, there is preponderant evidence to establish Petitioner suffered the residual effects of GBS for more than six months. (This record, however, does support the conclusion that Petitioner was mostly recovered thereafter – a factor relevant to pain and suffering to be awarded).

### III.    Requirements for Entitlement

Respondent has expressed his belief that, other than the foregoing severity issue, petitioner's claim meets the Table criteria for GBS (Opp. at 6), and I agree with that assessment. *See* 42 C.F.R. § 100.3(a)(XIV)(D); 42 C.F.R. § 100.3(c)(15) (the Table entry and Qualifications and Aids to Interpretation criteria). Thus, Petitioner need not prove causation. Section 11(c)(1)(C). However, Petitioner must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of

---

[9] Although Respondent cites to this document as Exhibit 2.3 at 230 - using the CM/ECF page number for this third part of Exhibit 2, as I have done throughout this Ruling, I am utilizing the exhibit and consecutive page number appearing in the Bates stamped pagination added by Petitioner.

petitioner's injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of his GBS for more than six months. *See supra* Section II.B.; Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine at his school in Oviedo, Florida. Exhibit 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV.     Appropriate Amount of Compensation

Although I have determined there is sufficient evidence to show Petitioner suffered the residual effects of his GBS until at least May 2017, I am not ruling on the appropriate amount of compensation at this time. I do note that the amount Petitioner seeks for his pain and suffering ($175,000.00) appears to be *slightly* higher than I would normally award for GBS with a moderate course, limited treatment, and few to no longer-standing sequelae. Thus, I encourage Petitioner to consider revising his existing demand. I do also, however, recognize the difficulties associated with any GBS illness, which affects (even temporarily) a petitioner's ability to perform basic tasks such as walking, talking, and eating. In this case, Petitioner undoubtedly experienced additional sadness, given his previous abilities and timing of his illness during his junior year of high school. These are factors that will be weighed against the overall-moderate course of Petitioner's illness.

### V.     Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table GBS and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master